IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:07cr250-MEF |
| | ) | (WO) |
| MICHAEL COLEMAN | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This case is before the court on defendant's motion to suppress (Doc. # 44). The court heard evidence on the motion on February 6, 2008. For the reasons set out below, the motion is due to be denied.

**Facts**

On October 5, 2007, DEA special Agent Bret Hamilton or agents working with him received a call from a Louisiana state trooper. The call indicated that troopers had stopped Coleman's co-defendant, Willie Joe Hall, and found three kilograms of cocaine in the trunk of his car, sealed in a box containing Pyle Blue stereo speakers. Hall stated that he wished to cooperate with law enforcement, informed the troopers that he was taking the cocaine to defendant Michael Coleman in Montgomery, Alabama, and agreed to attempt a controlled delivery. Hall had been to Coleman's house on at least one other occasion. After arriving in Montgomery, Hall described Coleman's house to agents and identified a photograph of the house.

Agents equipped Hall with a video recorder and an audio transmitter and instructed him to deliver the drugs to Coleman at his Montero Drive address in Montgomery in the

Vista View neighborhood. After the agents established surveillance around the house, Hall contacted Coleman via Nextel Direct Connect. Coleman informed Hall that, once he got close, he should not come to the house but should meet him instead at Sheridan Heights. Because agents did not have surveillance established in the Sheridan Heights neighborhood, they instructed Hall to continue to the Vista View location.

When Hall reached Coleman's house, he attempted to reach Coleman through Direct Connect. Coleman did not answer, but instead walked out of the house to speak with Hall, who was still sitting in his car. Coleman told Hall, "I don't want to take it out here. Just follow me to Sheridan Heights. Let's do it there. It's cooler," or words to that effect. After some discussion, Hall pulled out of the driveway in his car with Coleman behind him in a blue Ford F150. Within about a quarter of a mile from the house, agents stopped both vehicles. Two agents pulled their vehicles in front of Coleman's truck and motioned for Coleman and Hall to stop. The agents were wearing tactical vests that said "Police" or "DEA." They instructed Coleman to get out of the car, frisked him (finding a small amount of marijuana in his pants pocket), and handcuffed him. Coleman did not resist or attempt to flee. He was placed in the front passenger's seat of an officer's unmarked Ford Expedition and driven back to his own home.

At the house, Coleman remained in the car for a period of time with handcuffs on and the car door open. Hamilton explained to Coleman that agents believed that he was part of

a conspiracy to attempt to distribute three kilos of cocaine.[1] Coleman stated that he did not know anything about cocaine and that Hall had come to his house and wanted Coleman to follow him to Sheridan Heights. Hamilton stopped Coleman and told him that he was not questioning him and did not want a statement. He asked for permission to search Coleman's house and uncuffed Coleman. Coleman replied, "Yeah, you can search it. No problem."

Hamilton produced a consent to search form, and Coleman hesitated as though he was not sure that he wanted to sign the form. He asked Hamilton what would happen to him. Hamilton replied that if drugs were found inside the house, Coleman would be arrested immediately; if there were no drugs in the house, Coleman would be released and Hamilton would call the U.S. Attorney's office and discuss indicting Coleman at a later date. At some point in the conversation, Hamilton advised Coleman that he could refuse to consent or withdraw his consent at any time. He also told Coleman that, if he did not have anything to hide, there was no reason that he should not sign the form, and asked whether Coleman had any other questions. After Coleman sat and thought about it, he signed the consent to search form. Coleman was in the car at the house for a total of about 15 minutes before the search of the house began. His hands were not cuffed when he signed the consent form.

Hamilton obtained the house keys, and Coleman accompanied him to the front door. Coleman showed Hamilton which key opened the door, and Coleman used the security code

---

[1] Coleman denied that officers told him the reason for his detention, other than to inform him that he was being arrested for "conspiracy." The court does not find the defendant credible on this point.

to turn off the alarm once the door was open. Agents searched the house and found a glass microwave plate with cocaine residue; three weapons, including an assault style rifle; an airplane ticket or other paper with Coleman's name that had the address of Laredo, Texas; some microwaveable cups which agents believed were used to cook crack cocaine; another speaker box matching the one found in Hall's car; as well as other items.

There were as many as ten officers in the yard when Coleman signed the consent form. Three to four agents were in the immediate vicinity of the car. Coleman was not handcuffed when he signed the form, but he was cuffed again at some point during the search of the residence. He did not receive Miranda warnings prior to or during the search. He was released after the search, but was not free to go during the execution of the warrant.

## Discussion

Coleman's motion seeks suppression of any statements that he made to law enforcement officers without benefit of Miranda warnings. Motion to suppress (Doc. #44), 1-2. At the suppression hearing in this case, the government conceded that Coleman did not receive Miranda warnings, and indicated that it would not seek to introduce at trial any statements made by defendant to law enforcement. Thus, the motion to suppress is moot with regard to suppression of defendant's statements.[2]

Defendant also contends that he did not give voluntary consent to the search of his

---

[2] Defendant's consent to search itself is not considered to be a self-incriminating statement – that is, evidence of a testimonial or communicative nature – that would require prior Miranda warnings to be admissible. United States v. Hidalgo, 7 F.3d 1566, 1568 (11th Cir. 1993).

residence. "A consensual search is constitutional if it is voluntary; if it is the product of an essentially free and unconstrained choice." United States v. Acosta, 363 F.3d 1141, 1151 (11th Cir. 2004)(citations and internal quotation marks omitted). "Voluntariness is a question of fact based on the totality of the circumstances." Id. "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Id. (citations and internal quotation marks omitted). The Eleventh Circuit has

> identified the following factors as relevant in determining whether consent was voluntarily given: (1) whether the individual felt free to leave; (2) the exercise of coercive police procedures; (3) the extent of the individual's cooperation with the police; (4) the individual's awareness of her right to refuse consent, and whether the individual, in fact, could refuse consent; (5) the individual's education and intelligence; and (6) the individual's belief that no incriminating evidence will be found.... Additionally, in evaluating the surrounding circumstances, we take account of " 'subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.'"...We also have held that "[a] suspect does not consent to a search of his residence when his consent to the entry into his residence is prompted by a show of official authority."

United States v. Boulette, 2008 WL 450509, 3-4 (11th Cir. 2008) (slip copy) (citations omitted).

In this case, the court concludes that Coleman was not free to leave at the time that he gave consent to the search. Coleman was detained in a law enforcement vehicle when he consented, and his handcuffs were removed so that he could sign the consent form. Further, at the time that Coleman gave consent to search, three or four officers who were armed and

5

dressed in tactical vests were nearby, and another six to seven were in the vicinity. However, these facts do not, by themselves, render the agents' actions coercive. See United States v. Brown, 223 Fed.Appx. 875, 880, 2007 WL 934719, 4 (11th Cir. 2007) ("At the time Brown gave his consent, he was sitting in the back of the patrol car in handcuffs. We have concluded that far more serious shows of force were not coercive.) (Citing United States v. Garcia, 890 F.2d 355, 362 (11th Cir. 1989) (finding consent was voluntary even though fourteen law enforcement agents were present when the defendant was arrested and the defendant was handcuffed at the time he gave consent); United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir.1993) (concluding consent was voluntary even though the defendant had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint"); United States v. Espinosa-Orlando, 704 F.2d 507, 510, 513 (11th Cir.1983) (concluding consent was voluntary after four officers had drawn their weapons, asked the defendant to step away from his car, told him to lie on the grass, and asked for consent while he was on the ground and one officer still had his weapon drawn).

In this instance, the totality of the circumstances convinces the court that Coleman's consent was voluntary. The officers' guns were not drawn when Coleman signed the consent form. No threats were made against Coleman, nor was he overtly intimidated or coerced. He was not handcuffed when he actually signed the consent form. At the house, Coleman was in the officer's car for no more than 15 minutes before he consented and the search began. Although Coleman asserts that agents told him that they could get a search warrant if he did

not consent, such a statement does not render his consent involuntary.[3] Further, Hamilton advised Coleman that he could refuse to consent or withdraw his consent at any time. According to the testimony of the agent and defendant both, defendant paused to consider the consent form before he signed it. Coleman appeared to believe that no incriminating evidence would be found in the house.[4] Nothing before the court suggests that Coleman was in a particularly vulnerable subjective state. Although no specific evidence concerning Coleman's intelligence or education was presented at the suppression hearing, it was clear to the court from his demeanor and testimony that Coleman is capable of knowing, voluntary action.

In addition, Coleman assisted the officer in locating the correct keys for the burglar bars and the wooden front door. When the alarm began to go off, Coleman asked the agent, "Do ya'll want me to disengage that?" and then disabled the alarm himself. Coleman sat on the sofa or recliner in the house without incident during the search, and was also permitted

---

[3] A consent to search is not vitiated because officers told the defendant that they could attempt to obtain a search warrant if he did not consent to the search. United States v. Baker, 206 Fed.Appx. 928, 930, 2006 WL 3333048, 1 (11th Cir. 2006) (citing United States v. Garcia, 890 F.2d 355, 361 (11th Cir.1989) (concluding that consent was given voluntarily when officers told defendant that if he refused to consent to a full search, the officers would attempt to obtain a warrant)). Coleman also testified that the officers told him that he was going to jail for 20 years, or words to that effect. To the extent that agents made this or a similar statement to defendant, the statement was not an impermissible threat that Coleman would be jailed if he did not consent to a search, but a permissible prediction as to the possible consequences of the allegedly criminal activity for which he was detained.

[4] "So I'm like, okay. I'm like, well I know ain't no drugs in this house, you know what I'm saying. I said, so if I sign the consent for ya'll to search and ya'll don't find no drugs, that mean you going to release me? All right. So okay. I sat there, I thought about it for a few more seconds, and then I said, okay." Tr. 54.

7

to smoke outside with an agent without handcuffs at some point during the search after he asked for the cuffs to be removed.

Further, as noted above, the fact that the agents decided not to give Coleman Miranda warnings prior to his consent to search does not invalidate that consent. See United States v. Brown, 223 Fed.Appx. at 880, 2007 WL 934719, 4 at n. 3 (11th Cir. 2007) ("We have previously explained that a consent to search is not a self-incriminating statement and that the failure to give a defendant a Miranda warning does not render the defendant's consent to search invalid."); United States v. Payne, 119 F.3d 637, 643-644 (8th Cir. 1997) ("We have never held that a request to search must be preceded by Miranda warnings, or that a lack of Miranda warnings invalidates a consent to search.").

## Conclusion

Accordingly, for the foregoing reasons, it is the Recommendation of the Magistrate Judge that the motion to suppress (Doc. # 44) be DENIED. It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before March 24, 2008. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual

findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982). See Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982). See also Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 14th day of March, 2008.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE